IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| KEVIN CONNORS (TDCJ No. 1284939), <br><br> *Plaintiff,* <br><br> v. <br><br> TEXAS DEPT. OF CRIMINAL JUSTICE, UNIV. OF TEXAS MEDICAL BRANCH, and DOES 1-10, each in their individual capacity, inclusive, <br><br> *Defendants.* | **CASE NO.: 4:19-cv-2932** <br><br> (RELATED TO CASE NO.: 4:17-cv-1512) <br><br> **JURY DEMAND** <br><br> **COMPLAINT FOR DAMAGES AND PERMANENT INJUNCTION** |

## <u>ORIGINAL COMPLAINT</u>

TO THE HONORABLE JUDGE OF THE U.S. DISTRICT COURT:

Plaintiff Kevin Connors ("Mr. Connors") files this complaint for damages and a temporary, preliminary, and permanent injunction against Defendants Texas Dept. of Criminal Justice ("TDCJ"), University of Texas Medical Branch ("UTMB"), and DOES 1-10, each in their individual capacity, inclusive, pursuant to the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act ("Sec. 504"), and Eighth Amendment. Mr. Connors respectfully shows the Court as follows.

## I.    <u>STATEMENT OF THE CASE</u>

1.    Mr. Connors has a related case against defendants TDCJ, UTMB, as well as UTMB employees who failed to provide him proper care while was housed at the Darrington Unit. That case, being Civil Action No. 4:17-cv-1512 in this district, includes claims of institutional and individual refusals and failures to accommodate Mr. Connors' particular medical conditions as required by the ADA and Sec. 504, as well as those defendants' deliberate indifference to his

several and potentially life-threatening medical conditions in violation of the Eighth
Amendment, among other claims. That related case covers injuries Mr. Connors sustained when
that case was filed (May 16, 2017) and prior years within the limitations period.

2.     This current case brings similar claims concerning unlawful conduct while Mr. Connors
was transferred by TDCJ, now being housed at the Estelle Unit. The current case focuses on
violations of Mr. Connors rights at the Estelle Unit starting at the end of May 2019 (Mr. Connors
does not waive any injuries within the limitations period of this lawsuit). The injuries in this case
were committed at the Estelle Unit by different individuals than the Darrington Unit.

3.     In both the related case and this, particularly at issue are the clear medical needs of Mr.
Connors to be fed a "low-residue" diet. These medical needs expressly and repeatedly have been
confirmed by doctors at UTMB, which TDCJ contracts to provide inmate health care. At least
four times, UTMB providers expressly have prescribed that Mr. Connors receive a "low-residue"
diet. They have done so, consistent with established medical norms, because any more than a
trace amount of fiber in his food will cause him injury and possibly death. Already, Mr. Connors
has suffered at least 12 hospitalizations, including 5 major medical procedures or surgeries.

4.     In 2018, Mr. Connors was transferred to Harris County Sheriff's Office custody and held
in its county jail for several months for a *habeas corpus* proceeding regarding his underlying
criminal conviction. The trial court recommended that his conviction and sentence be set aside
and that he receives either a new trial or, alternatively, a new sentencing hearing. This ruling is
presently under appeal by the State of Texas.

5.     After winning the writ of *habeas corpus* in state court, on or about May 30, 2019, Mr.
Connors was transferred to the Estelle Unit. Since then and on every day until the present, Mr.
Connors has again been denied the low-residue meals that are at issue in his related case.

6.      TDCJ continues to refuse to provide low-residue meals even though they could be prepared using food regularly bought for inmates, and using existing kitchen facilities, simply and inexpensively. Indeed, the costs of so many hospitalizations and surgeries for Mr. Connors dwarf whatever cost might be incurred to provide him the "low-residue" diet.

7.      Mr. Connors is presently suffering adverse symptoms directly related to the wrongful diet that TDCJ and UTMB are feeding him. **Mr. Connors needs immediate hospitalization because he routinely leaks blood and pus from his anus with a foul, pungent odor, and because the bad diet already (since May 30) has sent him to the Estelle Unit infirmary where medical staff were unable or unwilling to provide substantive medical treatment.** These symptoms are similar to those he suffered previously when he needed hospitalization and was diagnosed with a life-threatening intestinal abscess. Mr. Connors believes that his colon is blocked again, as it has been before due to an improper diet at TDCJ, and that he may have a life-threatening abscess. Mr. Connors has requested medical care from gastroenterological physicians who are qualified to treat him and he may die without said treatment. At various times, despite actually knowing of the risks Mr. Connors faces, TDCJ and UTMB have refused to send him to a hospital.

8.      Mr. Connors is in fear for his life and seeks emergency injunctive relief.

## II.    JURISDICTION & VENUE

9.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343. Federal question jurisdiction arises pursuant to 42 U.S.C. §§ 1983, 12188(a).

10.     Venue is proper pursuant to 28 U.S.C. § 1391 because the injuries giving rise to this action happened in the Southern District of Texas and, on information and belief, all Defendants reside in the Southern District of Texas.

11.     All conditions precedent have been performed or have occurred.

### III.     PARTIES

12.     Plaintiff, Kevin Connors is a competent adult and an inmate in the custody of the State of Texas (TDCJ ID# 1284939).

13.     Defendant Texas Department of Criminal Justice, ("TDCJ") is an agency of the State of Texas. TDCJ operates and is responsible for the actions, omissions, policies, procedures, practices, and customs of its various agents, employees, agencies, departments, and Prison staff at the Estelle Unit. TDCJ has a several-year contract with Defendant UTMB for UTMB to provide medical services to TDCJ's inmates, including Mr. Connors.

14.     Defendant University of Texas Medical Branch, ("UTMB") is an agency of the State of Texas. UTMB operates and is responsible for the actions, omissions, policies, procedures, practices and customs of its various agents, employees, agencies, and departments, including the medical staff at the Estelle Unit.

15.     Plaintiff is unaware of the true names and capacities of Defendants sued herein as DOES 1-10, inclusive, and therefore sues these Defendants by such fictitious names. DOES 1-10 are agents, employees, or servants of TDCJ and/or UTMB and are actually and proximately liable for some or all of the injuries detailed herein. They are individually and collectively referred to herein as "Prison staff." Plaintiff will seek leave to amend this complaint to allege their true names and capacities when ascertained.

16.     Defendants TDCJ, UTMB, and Prison staff are occasionally referred to collectively as "Defendant" or "Defendants."

---

## IV. JURY DEMAND

17.     Plaintiff respectfully requests a trial by jury on all claims/issues in this matter that may be tried to a jury.

## V. STATEMENT OF FACTS

### Plaintiff is an ADA-Qualified Individual due to Protocolectomy

18.     In 2011, while in custody of TDCJ, Mr. Connors was diagnosed with colorectal cancer. He was successfully treated with a protocolectomy (removal of the colon and rectum) and radio/chemotherapy. As a consequence of the surgery, Mr. Connors has a stoma (a dime-sized opening between his small intestine and the outside) that connects to a replaceable ileostomy bag. His digestive waste must be fluid to flow from his small intestine into the ileostomy bag. He must use the ileostomy bag for the rest of his life.

19.     The UTMB medical specialists who originally treated Mr. Connors prescribed that he be given a "low-residue" diet to prevent serious and life-threatening bowel obstructions. Without the special diet, digestive waste will not be completely fluid and therefore not flow properly into the ileostomy bag. Solid digestive waste that bypasses the stomas will obstruct what remains of his bowels and may create a life-threatening abscess. Liquid digestive waste that is carried with the solids will seep uncontrollably out of Mr. Connors's anus along with other fluids, including blood and pus when his intestines are infected, that build up around the solids.

20.     Other UTMB medical specialists repeatedly have continued Mr. Connors's dietary prescription. For example, Dr. Siva Krishna Mannem, a UTMB Medical Oncology Fellow, reviewed Mr. Connors's April 2015 complaint that he was not receiving a low-residue diet. The doctor's subsequent written order was,

> "Please provide the patient with a low residue diet to prevent recurrent complications with rectal obstruction, which can likely result in another rectal infection and abscess formation that would likely result in patient to be admitted to a hospital necessitating long term antibiotics and surgical drainage, which may be a very morbid procedure for the patient."

21.     Dr. Mannem additionally commented,

> "Low residue diet should be daily osmolite in addition to his meals (boost is optimal but patient states that they don't provide that at the unit.)"

22.     *Osmolite* is a nutritionally dense, low-residue formula made specifically for patients like Mr. Connors. *Boost* is similar to *Osmolite*. Both formulas are meant to supplement an otherwise low-residue diet that may be nutritionally inadequate. Hence, a low-residue diet with *Osmolite* or *Boost* is nutritionally adequate but it's nutritionally inadequate without the formula.

23.     Mr. Connors was again prescribed *Osmolite* on later dates and his prescriptions extend through the present day. Mr. Connors's medical condition has not changed, hence his need for *Osmolite* or *Boost* has not changed and is not expected to change.

24.     Since 2011, Mr. Connors has had five or more emergency surgeries or other serious medical procedures and twelve or more hospitalizations caused by eating a diet other than a low-residue diet that resulted in bowel obstructions, infections, and/or abscesses.

25.     Therefore, Mr. Connors has physical impairments that substantially limit major life activities, defined as disabilities by the Americans with Disabilities Act, including, but not limited to: (a) Mr. Connors must eat a low-residue diet or risk hospitalization and death; (b) Mr. Connors needs numerous inexpensive medical supplies to keep the stoma hygienic or risk hospitalization and death; (c) Mr. Connors cannot defecate or control any digestive waste, and needs access to a toilet more frequently than other people; (d) Mr. Connors needs a compliment of medical care related to his condition including regular enemas; (e) Mr. Connors needs access to other general supplies such as an extra set of clothes and more frequent access to a shower on

those occasions that he leaks digestive waste on himself. Without these accommodations, Mr.

Connors is at risk for injury and death, and Mr. Connors is easily stigmatized by others when he

cannot care for and clean himself that results in his mental anguish, emotional distress,

embarrassment, humiliation, ostracism, and self-imposed isolation.

**Defendants Fail to Deliver Low-Residue Food**

26.     TDCJ Policy F-47.1 is "to establish guidelines for the ordering and provision of

therapeutic diets according to the orders of the treating provider" ("Food Policy"). *See* Exhibit 1.

The Food Policy establishes special therapeutic diets to treat and care for a variety of health

maladies among the prison population across the State of Texas. These diets include only:

a.     "**Diet for Health** … Ideal for offenders with diabetes, hypertension,

       hyperlipidemia, morbid obesity, or MSG sensitivity"

b.     "**Dialysis Diet** … *Only* for offenders receiving hemodialysis" (emphasis added)

c.     "**Protein Restricted Diet** … For offenders with chronic kidney disease or

       impaired liver function"

d.     "**Gluten Restricted Diet** … For offenders who have an allergy or sensitivity to

       gluten"

e.     "**Hypercaloric Diet** … For offenders with chronic diseases that are associated

       with wasting (i.e. cancer, HIV, and TB)"

f.     "**Mechanical Soft Diet** … For edentulous or essentially edentulous offenders and

       offenders with temporomandibular dysfunction"

g.     "**Pureed Diet** … For offenders with dysphagia (i.e. stroke) or who are otherwise

       not able to safely chew a Mechanical Soft Diet"

27.     The Food Policy now in effect was originally formulated Oct. 1985. The current Food Policy was made effective August 16, 2017 and was reviewed April 2019.

28.     TDCJ and UTMB have no special diet referred to by name or content as "low-residue" despite UTMB medical specialists prescribing a low-residue diet to Mr. Connors and other inmates. Consequently, TDCJ and UTMB policy makers have failed to instruct or give guidance to their employees, contractors, and servants (hereinafter collectively referred to as "employees") on the dietary needs of inmates like Mr. Connors who need a low-residue diet. The failure to establish a specific low-residue diet for said employees to follow is itself a policy, practice, or custom not to provide a low-residue diet to inmates who need or have been prescribed a low-residue diet.

29.     TDCJ and UTMB, and their employees, have had since 1985 or earlier to develop an express low-residue diet policy, practice, or custom for inmates similarly situated to Mr. Connors with partial bowel removal but have failed to do so despite knowing the pain, suffering, and life-threatening consequences to said inmates who are not provided a low-residue diet.

30.      TDCJ and UTMB, and their employees repeatedly have been reminded of the need to have such a low-residue diet, including (without limitation) each of the multiple times such a diet has been prescribed *by their own medical professionals* for Mr. Connors and each at least 12 times that Mr. Connors has been hospitalized, including five surgeries, necessitated by the lack of such a low-residue diet.

31.     Mr. Connors had his protocolectomy in 2011, giving TDCJ and UTMB eight years to develop an express low-residue diet for Mr. Connors and others similarly situated but each has failed to do so as recently as the April 2019 Food Policy review.

32.     Low-residue diets are neither difficult nor expensive to prepare. Foods that Mr. Connors needs are within the group of foods that TDCJ serves to other inmates and can be served at the same time as TDCJ serves other inmates. The difference is that certain foods must be avoided entirely, and certain foods require modestly different preparation to significantly reduce fiber – preparation that is simple in any TDCJ kitchen. TDCJ in fact stocks *Osmolite* to feed multiple different inmates (and *Boost*, the better alternative, easily could be stocked).

33.     TDCJ and UTMB do not train or guide their employees on what constitutes or qualifies as a low-residue diet. TDCJ's and UTMB's failure to establish an explicit low-residue diet inevitably leads to Mr. Connors and inmates similarly situated to receive an inadequate and life-threating diet. TDCJ's and UTMB's failure to establish a low-residue diet policy and failure to train or guide their employees on what constitutes a suitable low-residue meal is a policy itself, and a ratification and endorsement of their employees who provide improper food to Mr. Connors and other inmates similarly situated.

34.     Instead of a low-residue diet, UTMB's employee Dr. Ernestine Julye – the medical director of the Estelle Unit – has ordered that Mr. Connors be fed using the "dialysis diet" stated in the Food Policy. To the best of Mr. Connors' knowledge, no one at TDCJ or UTMB disputes that a low-residue diet is what he should receive. Dr. Julye has not and does not dispute that a low-residue diet is what Mr. Connors should receive. Dr. Julye recognizes, however, that TDCJ has refused to develop a low-residue diet, and she chose the "dialysis diet" for Mr. Connors from among those on the list. This present order has been in effect since before May 30, 2019.

35.     By express terms of the Food Policy, the dialysis diet is to be used "*Only* for offenders receiving hemodialysis." *See* Exhibit 1, page 1 (emphasis added.). Mr. Connors's medical condition affects his intestines, not his kidneys, he does not receive hemodialysis, so the dialysis

diet is not suitable for him even according to the Food Policy that states it is "Only" for offenders receiving hemodialysis.

36.     A dialysis diet is not the same as a low-residue diet, and – as multiple prescribing doctors at UTMB recognize when they prescribed a low-residue diet despite the dialysis diet being on the Food Policy – a dialysis diet is not healthy for Mr. Connors (or others similarly situated). Even if *arguendo* TDCJ/UTMB initially believed that a dialysis diet was sufficient for Mr. Connors—which Mr. Connors denies—the facts of Mr. Connors' having been hospitalized at least 12 times while not receiving the dialysis diet, his five surgeries caused by the lack of a low-residue diet, and his multiple trips to the infirmary, not to mention his obviously leaking bowels, make it patently clear that a dialysis diet is absolutely wrong for Mr. Connors.

37.     The dialysis diet is high in protein. A high-protein diet creates a high risk of cancer, heart disease, kidney disease, and osteoporosis.[1] The dialysis diet can be lower in fiber than the other therapeutic diets, but it is not low residue, and it includes foods that Mr. Connors cannot safely eat. Hence, TDCJ, UTMB, and Prison staff have decided not to follow UTMB medical specialists dietary prescription for Mr. Connors, not to amend their Food Policy and include a low-residue diet, not to train or guide their employees on what constitutes a low-residue diet, and instead give Mr. Connors a diet that is "Only for offenders receiving hemodialysis" while increasing Mr. Connors's risk of cancer, heart disease, kidney disease, and osteoporosis. Additionally, Mr. Connors survived cancer that, when he is served the dialysis diet puts Mr. Connors at an even greater risk of cancer recurring.

---

[1] *See* https://www.webmd.com/diet/guide/high-protein-low-carbohydrate-diets, accessed Aug. 1, 2019.

**Defendants Fail to Provide Plaintiff with Any Prescribed Diet**

38.     TDCJ and UTMB are on actual notice of Mr. Connors's dietary needs through, among

other things: (a) multiple consistent medical prescriptions by UTMB medical specialists who are

acutely aware of Mr. Connors's chronic medical conditions, (b) his hospitalizations, (c) his

surgeries, (d) his multiple trips to the infirmary, (e) his leaking bowels that regularly, literally,

stink up his environment, (f) multiple written grievances he filed before his related case, (g)

multiple written grievances he filed thereafter, (h) multiple verbal complaints to anyone who

would listen, (i) actual knowledge of the same issues in the related lawsuit against that has been

brought against some of the same defendants in the related case, and (j) readily available medical

literature that confirms the need for a low-residue diet as UTMB professions have prescribed –

including (without limitation) that the lack of such a diet puts Mr. Connors in mortal danger.

39.     Prison staff have not delivered a low-residue or dialysis diet on any day since Mr.

Connors was transferred back to TDCJ custody at the Estelle Unit on or about May 30, 2019. It

is both express policy of TDCJ, and clearly established practice of TDCJ, that neither Mr.

Connors nor anyone else receive a low-residue diet, no matter how significantly it is required.

40.     Mr. Connors has told Defendants through the grievance procedure, and verbally

including directly to Warden Hutto, Nurse Wilson, Mr. Mohammed, and acting kitchen captains,

that he needs a low-residue diet, and that his life is at risk if he does not get the diet. TDCJ,

UTMB, and Prison staff have continued to fail to deliver an adequate diet after actual notice.

41.     Instead, as the only meals fed to Mr. Connors, Prison staff routinely delivers food that is

high in fiber and dangerous for Mr. Connors to eat including, for example, corn, beans, greens,

spaghetti, goulash and other high fiber foods – on each and every day since May 30, 2019.

42.     Inmates who receive special diets typically have their food labeled as that special diet when it is delivered. For example, inmates on a dialysis diet will have a label stating "dialysis diet" accompany their food.

43.     Contrary to labels on food provided to Mr. Connors, however, on multiple occasions, including but not only since May 30, 2019, Prison staff delivered high-fiber food as described herein. That dangerous high-fiber food came to Mr. Connors with a "dialysis diet" label despite the fact that the actual food delivered was not compliant with the dialysis diet.

44.     Prison staff mislabel the food served to Mr. Connors to avoid any accusation of wrong doing that maybe revealed in an internal audit, to subvert or sabotage Mr. Connors's written grievances, and to avoid other liability whether administrative, civil, or criminal. Mr. Connors has had written grievances rejected because the investigation has checked only the internal records of food delivery and the internal records were deliberately falsified to state that Mr. Connors received the dialysis diet. Therefore, on at least these several occasions, TDCJ's grievance process is a sham because investigators refer only to falsified records. These acts amount to callous, despicable, malicious, and intentional harm by Prison staff against Mr. Connors.

45.     Defendants' delivery of wrongful food to Mr. Connors considering his well-known medical condition, hospitalizations, and years of dietary prescriptions indicate that Defendants are deliberately indifferent to Mr. Connors's serious and life-threatening dietary needs.

46.     In addition to the prescriptions for a low-residue diet, UTMB medical providers repeatedly have prescribed that Mr. Connors be provided three eight-ounce cans of *Osmolite* or *Boost.* Again, this is simple for TDCJ to ensure, but that is not done.

47.      Each day since May 30, 2019, Prison staff are supposed to deliver the three cans of *Osmolite* or *Boost to* Mr. Connors per his prescription. Each day, Prison staff walk by Mr. Connors's cell with his prescription on the delivery cart. When Mr. Connors sees Prison staff walk by, he is forced to race to his cell door and loudly bang on the door as the only way to get the Prison staff to return to his cell door and deliver his prescription. At this point Mr. Connors has made a habit of waiting at his cell door to preemptively bang on it when he sees Prison staff approaching. Mr. Connors is already suffering stress and anguish over his treatment by TDCJ and UTMB as described herein and in his related case. Prison staff's failure to appropriately deliver medical prescriptions and to create a pattern and practice of failing to deliver unless Mr. Connors bangs on his cell door is demeaning, humiliating, and intended to cause severe emotional distress and mental anguish. Defendants, and each of them, have created a hostile environment for Mr. Connors who cannot secure some of his medical prescriptions unless he begs Prison staff by banging on his cell door and some medical prescriptions, namely his low-residue diet, he cannot secure whether he begs or not.

48.      Mr. Connors is trapped between the proverbial rock and hard place. Mr. Connors knows he will repeatedly suffer intense pain, face surgeries and other hospitalizations, and other adverse consequences – including his quite quiet reasonable fears he will die from an intestinal abscess if he eats the wrongful food – multiple doctors have told him this. On the other hand, he certainly will starve, and suffer significant harm from lack of appropriate food – potentially including death, if he avoids the only food given to him. He does the best he can with what is served.

49.      Mr. Connors is in TDCJ custody and has no meaningful ability to select his own diet or seek private medical care. Mr. Connors relies on Defendants to provide the diet prescribed by UTMB medical specialists. Mr. Connors previously suffered an intestinal abscess while in TDCJ

custody that was extremely painful, caused enormous suffering, deemed to be life-threatening by UTMB medical specialists, and required hospitalization. Mr. Connors has had five surgeries or major medical procedures while in TDCJ custody and approximately twelve hospitalizations all related to bowel obstructions caused by a wrongful diet.

50.     Mr. Connors needs immediate court intervention to issue an order requiring Defendants to actually provide food that is safe for him to eat.

### Defendants Fail to Provide Urgently Needed Medical Care

51.     Mr. Connors has been suffering significantly worsening intestinal symptoms starting soon after he was transferred back to the Estelle Unit on May 30, 2019, generally including but not limited to intestinal cramps or spasms and uncontrollable anal leakage that contains blood and pus.

52.     Mr. Connors has isolated himself because of the anal leakage, because he cannot control the leakage, and therefore he leaks digestive fluid on an apparently random basis. Anal leakage is embarrassing and humiliating to him, it emits a foul odor that ostracizes him, and he is mocked and laughed at by inmates and Prison staff when he leaks and other times when inmates and Prison staff remind him of when he leaked. Mr. Connors even has been attacked by inmates while or immediately after he has leaked. Mr. Connors's self-imposed isolation as a consequence of anal leakage and improper diet also results in Mr. Connors not going outside for exercise or recreation, not going to the prison library, and avoiding other prison programs, services, and activities.

53.     On July 19, 2019, Victoria Connors visited Mr. Connors for a scheduled four-hour meeting. Approximately two hours into the meeting, Mr. Connors suffered intensely painful intestinal cramps followed by uncontrollable leakage out of his anus. The leakage was thick, dark

yellow/brown fluid with bloody mucous and a terrible pungent odor. Mr. Connors started to wipe his butt and back side with wads of paper towels that he brought with him. He banged on the visitation cell door and called for help while Victoria Connors also called for help.

54.     By the time Prison staff arrived, Mr. Connors had only soiled paper towels to clean himself and he continued to use the soiled towels as best he could. Prison staff who arrived didn't help him for at least ten minutes while he was in evident great pain and suffering. Upon their arrival, several Prison staff members left and failed to render aid.

55.     Eventually, due to his continuing symptoms, Mr. Connors was taken to the local infirmary. Mr. Connors was not given any substantive medical attention and too soon was returned to his cell. As he had done in similar past circumstances, Mr. Connors begged on this occasion to be taken to the UTMB Galveston hospital where he previously was treated before for similar symptoms. This time, as it had done on other times in the past, whoever was in charge from TDCJ and/or UTMB refused to take Mr. Connors to UTMB Galveston for diagnosis and treatment by UTMB specialists who are qualified to diagnose and treat Mr. Connors. After being returned to his cell, the symptoms continued, and Mr. Connors soiled himself with more digestive waste as he slept, and he had to clean himself again upon waking.

56.     The leakage of blood and pus reflects a dangerous probability that Mr. Connors has an abscess caused by Defendants' refusal to ensure a proper low-residue diet, formed by fibrous foods bypassing the stoma and accumulating in what's left of Mr. Connors's bowels.

57.     On information and belief, Prison staff have requested that Mr. Connors be seen by a physician at UTMB Galveston on what Prison staff call an "expedited basis," which means thirty days after the July 19 incident. Whether than even happens remains to be seen. This means Mr. Connors will not see a physician until at least August 19, 2019, despite Prison staff actually

knowing that Mr. Connors has blood and pus leaking out of his anus, and that these symptoms

for Mr. Connors previously required him to be hospitalized to safe his life.

## VI.   CAUSES OF ACTION

### CAUSE No. -1-
### Exclusion on Basis of Disability; Discrimination
### Alleged against TDCJ and UTMB

58.     Congress enacted the Americans with Disabilities Act and later the ADA Amendments

Act of 2008[2] upon finding *inter alia* that "society has tended to isolate and segregate individuals

with disabilities" and that such forms of discrimination continue to be a "serious and pervasive

social problem." 42 U.S.C. § 12101.

59.     TDCJ and UTMB are each a public entity under Title II of the ADA. 42 U.S.C. §

12131(1)(A). Title II of the ADA applies generally to jail "services, programs, or activities." 42

U.S.C. § 12132. Therefore, TDCJ and UTMB, including its jails and health services are covered

under Title II of the ADA.

60.     Plaintiff is informed and believes, and thereon alleges, that TDCJ and UTMB receive

federal assistance and funds, and are therefore subject to the Rehabilitation Act, 29 U.S.C. § 794.

TDCJ and UTMB are within the mandate of the Sec. 504 that no person with a disability may be

"excluded from participation in, be denied benefits of, or be subjected to discrimination under

any program or activity." 29 U.S.C. § 794.

61.     At all relevant times and as described herein, Mr. Connors was a "qualified individual" as

defined under the ADA and Section 504 of the Rehabilitation Act of 1973,[3] because of his

multiple physical maladies including but not limited to his:

---

[2] 42 U.S.C. § 12131(2).
[3] 29 U.S.C. § 794. 28 C.F.R. 42.540(k).

a. Physical disabilities due to his protocolectomy, including his inability to defecate and susceptibility to bowel obstructions and intestinal abscesses.

b. Open stoma that require regular care and cleaning.

c. Required use of an ileostomy bag.

d. Required medical "low-residue diet."

e. Required medical nutritional supplement *Osmolite* or *Boost*.

f. Special hygiene concerns related to anal leakage.

62. As a qualified individual, at all relevant times and as described herein, Mr. Connors was

a. An individual with a disability.

b. Qualified to participate in or receive the benefit of TDCJ's and UTMB's medical health services, programs, or activities.

c. Entitled to be provided with a special "low-residue diet" as prescribed by the physicians who are specialists in Mr. Connors's specific medical conditions.

d. Entitled to be provided with three eight-ounce cans daily of *Osmolite* or *Boost* as prescribed by the physicians who are specialists in Mr. Connors's specific medical conditions.

e. Qualified to participate in or receive the benefit of TDCJ's other services, programs, or activities such as outdoor exercise/recreational activities, indoor library services, et al.

f. Either excluded from participation in or denied the benefits of TDCJ's and UTMB's medical services and programs, including being denied an appropriate diet, and denied access to outdoors for exercise, the prison library, and other activities due to self-imposed isolation caused by TDCJ's and UTMB's failure to follow his dietary prescription.

g.  Such exclusion and denial of benefits was due to his disability or otherwise

discriminatory.

63.    TDCJ and UTMB are also liable through *respondeat superior* under Title II of the ADA

for the unlawful acts of their agents and/or employees; TDCJ is similarly liable through

*respondeat superior* for the unlawful acts by UTMB and its employees because TDCJ contracted

medical services from UTMB.

64.    TDCJ and UTMB are also liable through *respondeat superior* under the Sec. 504 for the

unlawful acts of their agents and/or employees; TDCJ is similarly liable through *respondeat*

*superior* for the unlawful acts by UTMB and its employees because TDCJ contracted medical

services from UTMB.

65.    TDCJ and UTMB are mandated to develop an effective, integrated, comprehensive

system for the delivery of all services to persons with physical disabilities, and to ensure that the

personal and civil rights of persons who are receiving services under their control are protected.

66.    As described herein, TDCJ and UTMB failed to reasonably accommodate Mr. Connors's

disability while jailing him and denying him medical care, causing him to suffer greater injury in

the process than other inmates, including repeated hospitalizations, surgeries, and ongoing

serious risk of permanent injury or death. TDCJ's and UTMB's failures to accommodate Mr.

Connors's disability include but are not limited to:

a.  Causing the violation of Mr. Connors's rights through all policies, practices, and

customs identified above.

b.  Failure to use lawful and appropriate policies, practices, and procedures for a physically

disabled person under circumstances specific to Mr. Connors's.

c.  Failure to have a policy and adequate employee training for inmates who are prescribed a low-residue diet .

d.  Failure to have a policy and adequate employee training for inmates who are prescribed *Osmolite* and *Boost* supplements.

e.  Failure to provide Mr. Connors with all items medically prescribed to him in a timely manner without Mr. Connors having to beg for his prescriptions.

f.  Failure to provide Mr. Connors with competent and appropriate medical care.

g.  Failure to send Mr. Connors to be diagnosed and treated by medical specialists when he is in evident immediate need and requests immediate diagnosis and treatment.

h.  Failure to develop an effective, integrated, comprehensive system for the delivery of all services to persons with physical disabilities, and to ensure that the personal and civil rights of persons who are receiving services under its control are protected.

67.    As a direct and proximate result of TDCJ's and UTMB's violations of the ADA and Sec. 504, Mr. Connors suffered more pain and punishment than members of the general population at each jail facility. Therefore, Mr. Connors sustained serious and permanent injuries and is entitled to damages, penalties, costs, and attorney fees.

### *CAUSE No. -2-*
### *Monell Violations*
### *Monell v. New York City Dept. of Social Services, 436 U.S. 658 (1978)*
### *Alleged against TDCJ and UTMB*

68.    Mr. Connors has a clearly established Eighth Amendment constitutional right to be provided with appropriate and adequate medical care including a medically prescribed diet that meets his nutritional needs, namely a low-residue diet and *Osmolite* or *Boost*, and not to have his life or wellness put in jeopardy by failures to abide by medical specialists' prescriptions.

69.     TDCJ and UTMB have one Food Policy established in 1985 that defines the only available therapeutic diets for inmates who are in medical need. None of the diets are expressly a "low-residue diet" by name or content. TDCJ and UTMB have failed to create such a low-residue diet as recently as April 2019 when its Food Policy was last reviewed despite being on actual notice that Mr. Connors (and others similarly situated) have been prescribed a low-residue diet by UTMB medical specialists who are acutely familiar with Mr. Connors's chronic medical condition and his medical needs.

70.     Instead of creating a suitable low-residue diet, TDCJ and UTMB have instructed that Mr. Connors be given the "dialysis diet" that is (a) explicitly "Only for offenders receiving hemodialysis" despite Mr. Connors not having known kidney disease and not receiving hemodialysis, (b) not exclusively low-residue, and (c) known for increasing a person's risk of cancer, heart disease, kidney disease, and osteoporosis. This diet repeatedly has caused Mr. Connors grievous harm.

71.     TDCJ and UTMB's policy, practice, or custom is therefore not to follow the dietary prescriptions given to inmates in need and instead to fulfill any dietary prescription with a different non-compliant diet rather than (a) develop a compliant diet and amend the policy, or (b) develop a compliant diet *ad hoc* for the particular inmate in need. TDCJ and UTMB, through this Food Policy, violate the constitutional rights and safeguards for inmates who are in medical need of a specific diet when inmates in their custody and control have no choice but to eat food that is not suited to their medical needs and instead they are fed inadequate and harmful diets. The lack of a low-residue diet under these circumstances is itself a policy not to provide Mr. Connors (and inmates similarly situated) with food that he needs and instead a policy to feed him inadequate and harmful food.

72.     In addition, TDCJ and UTMB have a widespread practice or custom to fail to train or guide Prison staff and other employees with the requirements of a low-residue diet that actually and foreseeably result in inmates not receiving their prescribed low-residue diet. Also, the failure to train and guide Prison staff of Mr. Connors's (and others similarly situated) dietary needs marginalizes and ostracizes Mr. Connors in such a way that Prison staff will not take Mr. Connors's needs seriously. This actually and foreseeably results in Prison staff to mislabel food for nefarious reasons including, but not limited to, to harass, retaliate, and punish inmates, to humiliate and mock them, and to escape accountability by way of any internal audit, investigation, or administrative, civil, or criminal liability.

73.     The policies, practices, and customs described herein have resulted in Mr. Connors not getting his necessary and medically prescribed food since May 30, 2019, and other dates between the filing of his related case until the present, while he was in TDCJ custody.

74.     Additionally, TDCJ and UTMB, through its injurious policies, practices, and customs described herein endorse and ratify Prison staff's conduct when Prison staff fails to deliver low-residue meals to Mr. Connors, as TDCJ and UTMB have failed to train or guide Prison staff on the requirements of a low-residue diet and instead have required them to deliver the non-compliant dialysis diet. Prison staff variably delivers the dialysis diet or a high fiber diet but never a low-residue diet in furtherance of TDCJ's and UTMB's endorsement and ratification of said acts. Prison staff continue to fail to deliver an appropriate diet to Mr. Connors because TDCJ and UTMB have not required them to do so.

75.     Additionally, TDCJ and UTMB have failed to train its employees on medical crises and appropriate protocols related to Mr. Connors (and others similarly situated), such that when Mr. Connors has blood and pus leaking out of his anus, he is not immediately sent for specialized

medical care. Instead, TDCJ and UTMB policy, practice, or custom, is to order the inmate back to their cell. Further, only on the whim and discretion of Estelle Unit medical staff, Mr. Connors (like others similarly situated) is scheduled to see a specialist on a so-called "expedited basis," which is a euphemism for at least thirty days, because Estelle Unit medical staff is not trained on Mr. Connors's particular medical needs despite him being held at the Estelle Unit for years.

76.     The express or implicit policies, practices, and customs described herein have caused or substantially contributed to Mr. Connors physical, including life-threatening, emotional, and mental injuries as described herein.

### CAUSE No. -3-
### Deliberate Indifference - Failure to Provide Medical Care
### Eighth Amendment Violations | 42 U.S.C. § 1983
### Alleged against Prison Staff (DOE Defendants 1-10)

77.     Mr. Connors has a clearly established constitutional right to be provided with appropriate and adequate medical care including a medically prescribed diet that meets his nutritional needs.

78.     Mr. Connors knows that he has been mistreated as described herein by multiple persons on the Prison Staff at the Estelle Unit, but he does not know their names. They are identified herein as DOE Defendants 1-10.

79.     Being Prison staff, the DOE Defendants each know

   a.   Mr. Connors survived cancer treatment that included a protocolectomy.

   b.   Mr. Connors is and was prescribed a "low-residue diet" including but not limited to three eight-ounce servings of *Boost* (or, as an inferior alternative, *Osmolite*) daily.

   c.   Not receiving the prescribed low-residue diet puts Mr. Connors's health and life in serious jeopardy.

   d.   When Mr. Connors has not received the prescribed low-residue diet, Mr. Connors has been hospitalized, including surgery, to save his life.

e.  When Mr. Connors has not received the prescribed low-residue diet, Mr. Connors is at risk of multiple severe symptoms of bowel obstructions including extreme pain and suffering, abdominal swelling and distension, dizziness, fever, and vomiting.

f.  When Mr. Connors has not received the prescribed low-residue diet, Mr. Connors routinely gets blood, pus, and digestive waste leaking out of his anus.

g.  Prison staff are on actual notice of Mr. Connors's dietary prescriptions, medical needs, and the serious and life-threatening consequences if his needs are not met.

80.   Mr. Connors suffered damages, pain and suffering, multiple hospitalizations, multiple surgeries, emotional distress, mental anguish, anxiety, depression, and deprivation of constitutional rights because of Prison staff's deliberate indifference and/or callous disregard for Mr. Connors's need for medical care and treatment, and their disregard and indifference to this need.

81.   The conduct of Prison staff entitles Mr. Connors to punitive damages and penalties allowable under 42 U.S.C. § 1983.

## VIII. DAMAGES

82.   As a direct and proximate result of each Defendant's acts and/or omissions as set forth above, Mr. Connors has sustained and is currently sustaining physical injuries, pain and suffering, emotional distress, mental anguish, violation of his constitutional rights, and economic damages. Unless Mr. Connors obtains injunctive relief, he  will likely continue to sustain these injuries for the indefinite future.

## IX. REQUEST FOR RELIEF

83.     WHEREFORE, Mr. Connors requests that this Court enter judgment in favor of himself against each Defendant, jointly and severally, on all causes of action, and for the following additional relief:

   a.   Actual damages that may be allowed under federal law in an amount according to proof and which is fair, just, and reasonable.

   b.   Punitive damages against Prison staff, that may be allowed under federal law which is fair, just, and reasonable.

   c.   Temporary, Preliminary, and Permanent injunctive relief to require Defendants, and each of them, to deliver low-residue meals three times daily, and to deliver them in a fair and non-discriminatory, non-punitive, and non-retaliatory manner, as medically appropriate.

   d.   In the alternative to the above-requested permanent injunctive relief, Mr. Connors requests release from prison under compassionate care doctrines so that Mr. Connors does not die in prison due to wholly preventable medical conditions and a deliberately indifferent medical staff.

   e.   All other damages, penalties, costs, interest, and attorney fees as allowed by 42 U.S.C. §§ 1983, 1988, and 12205; Title II of the ADA; 29 U.S.C. §§ 794 and 794a; and as otherwise may be allowed by federal law;

   f.   *Respondeat superior* liability for TDCJ and UTMB pursuant to ADA, ADAAA, and Sec. 504;

   g.   Interest, both pre- and post-judgment, as permitted by law;

   h.   Such other and further relief as the Court may deem just and appropriate.

Respectfully submitted,

*/s/ Jerold D. Friedman*
Jerold D. Friedman
California SBN 290434
SDTX Federal ID 2117436

LAW OFFICE OF JEROLD D. FRIEDMAN
19744 Beach Blvd. #390
Huntington Beach, CA 92648
(213) 536-1244
fax (281) 667-3506
lawoffice.jdf@gmail.com

**Attorney for Plaintiff**